Number 161304 Andrew Hagerty v. Cyberonics, Inc. Good morning, Your Honors. May it please the Court, I'm Joseph Hall on behalf of Appellant Relator Andrew Hagerty, and with the Court's permission I'd like to reserve three minutes for rebuttal. I'm sorry, how many? Three. Thank you. The District Court below found that Relator, a former sales representative for Appellee Defendant Cyberonics, alleged that Cyberonics engaged in a fraudulent scheme with the requisite particularity required by Rule 9b. Relator's allegations, which the District Court found were unquestionably adequate, were that Cyberonics concocted and executed a fraudulent scheme to boost its profits by encouraging medical providers to engage in unnecessary replacement of BNS devices. These are devices implanted in patients with severe epilepsy to help manage the symptoms. Notwithstanding the sufficiency of the allegations regarding the fraudulent scheme, the District Court nevertheless dismissed the complaint and ruled that Relator had failed to allege the submission of false claims with the requisite particularity. Relator's operative complaint, however, alleged specific providers who had submitted false claims for reimbursement to government programs at hospitals and at group homes such as Southbury, Monson, and Rentham at paragraphs 114 and 119. It alleged specific doctors who had been the subject of the fraudulent scheme and who had replaced BNS devices prematurely as a result, Drs. Penney and Thompson at paragraphs 115 and 120. It identified specific Cyberonics employees who had engaged in the fraud, such as employees Kane, Monson, Holland, and Button at paragraphs 77, 91 through 93 and 94. It identified specific employees who had committed, such as by falsified battery life calculations and by use of fraudulent diagnostic equipment, such as at paragraphs 75 and 92. It identified specific periods when fraudulent claims would have been submitted, such as between March to May 2010, as alleged in paragraph 114. It identified the relevant billing codes for the procedures at paragraph 116 and the exhibits to the complaint. It identified the approximate amount of the invoice, which was at least $34,000, at paragraphs 62 and 123. It identified the specific government programs that were defrauded at paragraph 120. It identified or alleged that the defendant had specifically targeted government health care patients and programs as part of the fraudulent scheme at paragraphs 160 and 180. Ultimately, you're going to have to tie these things together in some way. Otherwise, it just doesn't work. So 114 and 119, say again what you allege there. I'm sorry. So 114 was the time period of the... And 119 said at one point there were providers who made claims for payment. Do you allege any of that? I'm sorry. There were specific providers who had submitted false claims for reimbursement? Okay. That paragraph, that sounds like the closest thing you've got to a... Yes, it seems like the closest thing you've got to an allegation that there was a claim submitted that was false. Right? Would you identify who submitted a claim for payment? Well, we're identifying specific facilities where, yes, we believe that claims were submitted for payment. You don't identify as any specific claim. Well, Your Honor, with all due respect, I don't think that we're... Excuse me. Is that correct? Do you identify any specific claim that was submitted that was false that was paid by the government under... If you mean, do we identify a piece of paper that was submitted on this date by this provider for this patient? Yes. Would you identify a patient that we believe was subject to a false, for which a false claim was submitted? That doesn't answer my question. Do you identify a specific claim that was submitted on a particular date for a particular patient to a particular provider, to a particular government agency, and paid under, as a result of this fraudulent scheme? No, Your Honor. We allege... Well, why isn't this case then Kelly versus Novartis? Well, Your Honor, for a couple of reasons. First of all, what Kelly says, and Kelly dismisses for a number of reasons. First of all, it employs the Duxbury analysis and says what you have to have is a fraudulent scheme and proof that false claims were submitted, or allegations that give rise to an inference, a strong inference that claims were submitted. In Kelly, both complaints, the judge below, Judge Young, found that there was insufficient allegation of a fraudulent scheme. So we're not Kelly for the very basis that the judge here found that there was... You're saying that you proved enough of a fraudulent scheme, you don't have to have a specific claim. That's correct, Your Honor. Yeah, and what's the case that says that?  Duxbury says there were specific false claims. In Duxbury, there were specific claims. There were no... There were several, and in Duxbury, we said even with those, it was a close case. Your Honor, what Duxbury identifies are providers, he identifies dates, rough dates, which are two-year periods, and he says that half the money would have come from Medicare. But he never identifies particular claims. He never says on this date there was a claim submitted by this facility for this patient. And so you've done the same, you say, by identifying what... How many providers do you identify? Well, at the very least, Your Honor... There could be. At the very least, we identify three different group homes, and we identify two specific physicians. And the way you say it's like Duxbury is you've alleged that those group homes with these patients must have... I mean, just fill in the blanks for me. Yes, must have sought reimbursement from Medicare. Even though we can't identify any reimbursement that they sought? That is the same as Duxbury. Duxbury says 50% of funds for this drug come from Medicare. That's what he says. He does not identify as particular false claims. And what we are saying is in these group homes, most, if not all, of these patients are covered by Medicare. And so when the facility goes to submit claims for reimbursement, they are necessarily submitting to Medicare. This claim is also unlike, I think, off-label claims where you have difficulty with trying to ferret out exactly which claims are at issue. And I think that this really goes to the purpose of 9B, which is to put defendants on notice and allow them to investigate. How can they investigate if they don't know what you're referring to? But they do know. They have every detail they need. They know the provider. They know the date. They know the description of what procedure we're talking about. And so they're able to go to their records and say, on this day, at this facility, we have X number of patients where a device was replaced, and we know that Medicare paid for that claim. That provides all that the defendant needs in order to be able to investigate and defend the fraud. And we think that is the purpose behind 9B. The problem with a case such as Kelly or Gee is that defendant is looking at an undifferentiated mass of millions of claims and saying, where do I go? But when a relator can identify with sufficient particularity a set of claims that defendant can go to and determine the basis for the allegation, that is all that 9B requires. Thank you. You have three minutes. Yeah. You did reserve time, right? Yeah. Good morning, Your Honors. Bill Katz of Thompson & Knight here on behalf of the defendant, Applebee's CyberOnyx, Inc. Judge Barron, let me answer your question that you just asked about which case says that if you sufficiently allege a fraudulent scheme, that that's enough to articulate and meet 9B. The answer is there is no case like that. In fact, the Gee case is exactly to the contrary. Yeah, but he's making a slightly different argument, which is that when you've alleged a fraudulent scheme and you've identified a universe of claims, even though you don't have a specific claim, that gives you enough knowledge to go then check and find out whether what you're alleging is plausible or not, you have all you need under 9B. So what's wrong with what he's saying? Because it doesn't meet the particularity and the heightened plea and requirements under 9B. Is that an acceptance then of his premise that actually you could do just what he said from the information he gave? No, not at all, because this is not a direct submission case, right? They rely upon Duxbury. Duxbury says if it's an indirect submission case, we're going to apply a more flexible standard, but it basically says you still need to come in with specifics. And you're right. Duxbury, there were, Judge Stahl, you're right, there were eight specific claims, okay? There were specifics about providers. There were specifics about dollar amounts. There were specifics about locations. And there were specifics about time. Here, they're not. That just seems a little bit hazy to me, what you're saying. Was there a claim identified in the sense like on September 7th, X claim was filed? Like, I just can't remember if Duxbury said that there were claims like that. It wasn't necessarily as specific as this piece of paper claim, but the allegations were specific enough to identify. But that's his argument, is that the allegations here are specific enough, so why aren't they? They're not specific enough. First off, the providers here are only the physicians. These group homes, it's a red herring. The group homes do not submit claims. So all these allegations that large percentages of the population at Southbury, at Rentham, at Monson, may have been eligible or qualified for a government health care plan, doesn't tell you that there were any false claims submitted. Or that anybody actually submitted a claim, that the physician wrote a prescription and submitted it. Exactly. In fact, the allegations to the contrary. Here, we take their allegations as true. Their allegations show that they interviewed Dr. Kahn, they interviewed Dr. Thompson. There are no allegations that Dr. Kahn or Dr. Thompson said to them, oh my gosh, I submitted a false claim, a claim for a payment to the government. Also, there's no specifics as to which government program is at issue here. There's a lot of allegations about Medicare slash and or Medicaid. They don't tell you which one that there is. And I think here, there's three things that they need to show here, with respect to articulating a claim that meets 9B. Okay, you have to show that a patient was covered by a government plan. That's number one. Secondly, you have to address the medical necessity issue. You have to allege that there was, in fact, a medically unnecessary procedure performed. And third, you have to say that there was a false claim for payment submitted to the government in connection with that medically unnecessary procedure here. We're a little bit different than all these cases, whether it's Roast, Duxbury, Escobar, Guy, or Kelly. Those cases all had these kind of categorical per se approaches to fraud, right? Those are all either off-label pharmaceutical cases where the Food, Drug, and Cosmetic Act says if you submit a claim for an off-label use, it's automatically improper. In the Escobar case, right, we have the Mass Health Regulations that specifically said you must be licensed, you must properly supervise, categorical. Anti-kickback statute, like in Kelly and Duxbury was anti-kickback statute too. So here we have a situation where the plaintiff's allegations admit, if you look at paragraph 68 of the complaint, if you look at where it talks about the individualized nature of what goes into determining whether or when to make a device replacement, okay, and that doctors are making these individual determinations, and this is why you can't categorically say, well, if I've sufficiently played a fraudulent scheme, then therefore all these surgeries must have been medically unnecessary. Well, no, that's not the case because we know, for example, with Dr. Kahn, Dr. Kahn said, Mr. Munson, the sales rep, he was unethical. I didn't follow his advice. So the evidence in their complaint, which we must take as true, shows that doctors didn't fall for this alleged fraud. So your point is that all you would know from their complaint is that if there was a claim filed, it was filed from some patient at one of these group homes. Absolutely. And you can't be then responsible for calling through and figuring out which one they must have in mind. Not really, because they don't even tell you, was that patient specifically covered by a government plan? Was that procedure medically unnecessary? When we know, and they admit, that the treatment of these patients is highly individualized, your setting on your device could be totally different than mine because your seizures are much more intense and much more frequent. So there's all kinds of individual issues that come up in this. And obviously the district court didn't reach this issue, but we argued that that NOAC case from Judge Woodrock, it's a district court case, but it talks about medical necessity. Just realistically, is there any way for you to know just what the universe of people they could be talking about is? No, I don't believe so. From their complaint? Are we talking a plausible universe of a dozen people, or is it a thousand people? I don't know that we know for sure. I mean, I think it's likely more than a dozen. If you look at their complaint, the statistics that they're relying upon were based upon revenues. What they've alleged is that cyberonics derived... No, I meant in terms of the parts of their complaint that seem focused on identifying the specific claim. Okay. What's the plausible universe of people that they could even be talking about? It's people who got the device, right? Absolutely. We know who that is. Right. How many people could that be? I don't know. I don't know. I don't know that that's necessarily in the record, because all they have, they have allegations... What I'm getting at is if it was a small, really small number, then you might think, well, what more do you need to... Well, I think if they're alleging that one of that small universe was the one who submitted the claim, then you'd be able to figure it out pretty readily, right? Well, not necessarily, because they're trying to extrapolate and articulate... No, no, but under our case law, it's an odd feature of our case law. If you can prove one specific claim, they seem to let you get in the door to a million claims for which you've pled no specifics, but you can't get in the door unless you've pled one. I mean, maybe that's... but you've got to at least pled one. You're saying they haven't done that? They have not pled even one. Right, not even one. So I'm just asking, well, if they gave you enough facts that you could basically deduce without a whole lot of effort, which one they must be talking about, how prejudiced are you by the lack of specifics in their complaint? It's just a matter of where we set the line on the continuum of very, very specific and very general. Right. Well, I think here, a couple things. First off, Duxbury said it was the floor and it was eight. So I think it's more than one, at least one, but I think it's at least eight. I mean, you need to have some nucleus or cluster of claims. I don't think you could get by with just one, okay? And I think you also have to make sure that you've covered all three elements. You have to show that that patient was actually covered by a government health plan, subjected to a medically unnecessary procedure, and that there was a claim for payment submitted to the government in connection with it. And they don't have any of that. There's no one patient. There's no one provider where they can check all those boxes here. Now, if they were able to get one, personally, under my reading with Duxbury, I don't think one is sufficient. They would need to have some sort of cluster. 27 was sufficient in Escobar. Eight was sufficient in Duxbury. So I agree with you that on an indirect case, the standard is more flexible, okay? But it's not that I'm not sure that one necessarily gets you there, okay? And I think if I were drawing the line, and the court has already said Duxbury is a close call, but it's barely sufficient, and that's eight, I think, again, it needs to be some sort of nucleus or cluster, and we're just not there on that yet. And not only are we not there yet, but even on the issue of the amendment, I mean, abuse of discretion, Judge Saylor properly denied leave to amend. Even the Second Amendment complaint doesn't get them there. I know this is sort of an issue on both claims, both on the federal plea fraud particularity under Rule 9b, he was correct, also on the ability to amend, he was correct. I mean, Judge Saylor devoted 70 pages of opinions to analyzing two detailed complaints, more than 100-page complaints here. But the issue on the motion to amend is somewhat different because Judge Saylor didn't base that on futility. He based it strictly on undue delay. Well, I think there's a debate about what the meaning of the opinion is. There's no debate about that. He said in the opinion that he wasn't basing the opinion on futility. I think he said, but it would also be futile. Clearly, though, undue delay, I don't think there should be any debate under this court's case law, undue delay is an independent basis for denying leave to amend. Multiple cases have articulated that. No question here, when you look at the sufficient amount of time that the relator had to investigate this claim, the case was filed on February 4, 2013. They didn't seek leave to amend until October 14, 2015. It's more than two and a half years later. It was within four months of the time that their complaint was dismissed. It's true, although this court has a case, which I believe you were on the panel, Judge Saylor, where two weeks from the dismissal to the time of seeking leave to amend was found to be too long. Yeah, but that was a case that also involved the finding of prejudice, which wasn't made here. Right. Well, Your Honor, clearly undue delay here, especially in a situation under the False Claims Act, where the relator has an obligation prior to filing suit to investigate his claims presented to the government. All this information, there's no question all this information was available to him at the time he filed suit. And after the motion was filed, he certainly knew what the alleged deficiencies were, and he could have filed an amendment shortly thereafter. Absolutely. He had sufficient time to do that both after the ruling, and also he had sufficient time for the two and a half years beforehand to do that. Thank you. Thank you. Your Honor, I think it's very important that what Pelley is asking you to do here is effectively to overrule Duxbury. Because if you look at 579F3 at 30, the Duxbury opinion, there are not eight claims. There are eight providers. If you look on page 25 of our brief, you will see corpse reciting Duxbury. In Duxbury, the most specific information about the false filing itself was that Western Washington was reimbursed by Medicare for the free commercially packaged cochran. There is simply no identification of particular claims. I don't understand. That is the identifying the person who makes the claim, the entity that makes the claim, and saying that they got paid on that claim. And we are identifying doctors, and we are identifying facilities where those patients came from. But the facilities aren't making the claim. The facilities are where the patients are. You don't identify any patient that made the claim. So there's no doctor that you identify who made a claim on behalf of a patient in that provider, do you? No, we identify two doctors. We identify Drs. Pena and Thompson. And what do you say about them? That they had patients for which they did this procedure. But you don't say that they made a claim on their behalf. So unlike in Duxbury where there is somebody who made a claim. The doctors are making the claim, Your Honor. I'm not following. The doctors are seeking reimbursement for their services. For a patient that they did the allegedly fraudulent thing for? Yes. You allege that? Yes. How did you allege that? By doctor's name? By date? By amount? We allege that within a time period. But we allege that Drs. Pena and Thompson in Paragraph 115 and in Paragraph 120 What did they do? Had patients where they sought or undertook Had patients not identified? No, Your Honor, they're not identified. But within a time period and in such facilities for which they undertook unnecessary medical device replacements. And? And that they would have sought reimbursement from Medicare. You said that it would have or did seek? I'm not really sure. Well, I'm just asking. Right. That's a yes-no. You either said they did seek the comorbidity. What we say is for patients for which device replacements were undertaken they would have sought replacement from Medicare. These are $34,000 procedures. I think the problem with this court's jurisprudence in this area all springs from Rost. Rost is a case in which the court says, look, there's evidence here that some people who are covered by Medicare are nonetheless paying for it outside. That is not a plausible inference here where you're talking about a $34,000 procedure. There's just no plausible inference that the patient is going to pay for it. So just if I understand the argument, you want us to say because you think we have to say that the doctors you identified in paragraph 115 during the time period that they operated in doing those procedures are identical to the entities that made the claims that we found sufficient in Duxbury. Yes, sir. And that's the whole of the case. If you disagree with that, you lose. If you agree with it, you win. Well, not entirely. We're also identifying with enough particularity. I think you asked a very good question. What is the universe of claims here? There's 10,000 of these surgeries performed. It's over a three-year period. So roughly 3,300 procedures a year. Then we're identifying places with sufficient particularity that they can check their database given the time period involved and determine exactly who the patients are. The SG in filings in both Decatur and in Duxbury to the Supreme Court has said, look, it is unrealistic to think that a lawyer can come forward with details on payments. But what is helpful to the United States and what furthers the interest of the False Claims Act is when they give us details of the fraud. And then enough to satisfy us that some claims were submitted. And that is what we have done here. If there are no other questions, we're on.